UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EREKLE GUGAVA,<br><br>Defendant | Criminal No. 26- cr10243<br><br>Violation:<br><br><u>Count One</u>: Conspiracy to Commit Money Laundering<br>(18 U.S.C. § 1956(h))<br><br><u>Forfeiture Allegation</u>:<br>(18 U.S.C. § 982(a)(1)) |

# INDICTMENT

At all times relevant to this Indictment:

## General Allegations

1. The defendant, EREKLE GUGAVA ("GUGAVA"), was a citizen of the country of Georgia and the owner of ND Medical Solutions, LLC ("ND Medical").

2. Co-Conspirator 1 was known by the alias "Kate."

3. Individual 1, a resident of Montgomery County, Pennsylvania, was the founder and original owner of ND Medical.

4. ND Medical was a durable medical equipment ("DME") company incorporated in Pennsylvania with a physical location in Fort Washington, Pennsylvania.

5. Entity 1 was a health insurance company incorporated in Massachusetts and located in Springfield, Massachusetts. Entity 1 provided health insurance to members in Massachusetts, Connecticut, and Vermont.

6. Entity 2 was a health insurance company incorporated in Massachusetts and located in Canton, Massachusetts. Entity 2 provided health insurance to members in Massachusetts and Rhode Island.

7. Financial Institution 1 and Financial Institution 2 were banks with physical locations throughout the United States.

<u>Background</u>

*The Organization*

8. A transnational criminal organization based in Russia and elsewhere (the "Organization") orchestrated a multi-billion-dollar health care fraud and money laundering scheme to defraud the Medicare program ("Medicare") and other insurers, including private health insurance companies that contracted to provide Medicare supplemental insurance policies that helped pay for the beneficiary's share of Medicare expenses ("Medicare Supplemental Insurers"). To date, the Organization has submitted or caused the submission of billions of dollars in fraudulent claims for DME to Medicare and Medicare Supplemental Insurers.

9. As part of the scheme, the Organization purchased dozens of DME companies, including ND Medical (collectively, the "DME Companies"), from prior legitimate owners that had the ability to submit claims to Medicare and Medicare Supplemental Insurers. The Organization executed these purchases by paying foreign nationals and others to serve as nominee owners of the DME Companies.

10. After the Organization gained control of the DME Companies, it rapidly submitted or caused the submission of billions of dollars in fraudulent claims to Medicare and Medicare Supplemental Insurers for DME that was not medically necessary, not properly prescribed by a health care practitioner, and/or not provided by the DME Companies. The Organization did so by

using the personal identifying information of more than one million Americans spanning all 50 states, including Massachusetts. Many of these individuals reported their concerns to Medicare and its contractors after receiving explanation of benefits ("EOB") forms that reflected their purported receipt of DME that they did not in fact receive, that was purportedly prescribed by doctors whom they had never visited, and that was purportedly delivered by the DME Companies, with which they were unfamiliar.

11. Once Medicare and Medicare Supplemental Insurers paid the DME Companies for these fraudulent claims, the Organization funneled the funds through financial accounts opened by the nominee owners of the DME Companies. To facilitate the opening of these accounts, the Organization provided the nominee owners with corporate registration records and sale documentation that disguised the true beneficial ownership of the DME Companies.

12. Medicare and Medicare Supplemental Insurers paid the DME Companies by ACH, wire transfer, and/or check. Once the funds were transferred or deposited into the financial accounts opened by the nominee owners, the Organization directed the funds to shell companies and to various overseas bank accounts.

*ND Medical*

13. GUGAVA and Co-Conspirator 1 were members of the Organization.

14. On or about February 18, 2025, Individual 1 sold ND Medical to GUGAVA. GUGAVA purportedly owned ND Medical until on or about July 9, 2025, when he left the United States.

15. As an extension of the Organization, and during the limited five-month span of GUGAVA's purported ownership, ND Medical submitted fraudulent DME claims to Medicare, Medicare Supplemental Insurers, private employer-sponsored plans, and other insurers. ND

Medical submitted fraudulent DME claims to Medicare and Medicare Supplemental Insurers totaling approximately $1,317,921,030. Medicare paid ND Medical approximately $566,882 (via electronic transfer), and Medicare Supplemental Insurers, private employer-sponsored plans, and other insurers paid ND Medical approximately $5,945,442 (by various means, including by check), as a result of these fraudulent claims, for a total of approximately $6,512,324. Medicare and Medicare Supplemental Insurers likely would have paid ND Medical far more if it were not for an early payment suspension.

16. Numerous beneficiaries submitted complaints after receiving EOB forms that reflected them purportedly receiving DME from ND Medical—a company with which they were unfamiliar—that they did not in fact request or receive and that was purportedly prescribed by doctors whom the beneficiaries had never visited.

*Medicare, Medigap, and Durable Medical Equipment*

17. Medicare was a federally funded health insurance program that provided benefits to individuals who were 65 years of age or older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services.

18. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

19. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

20. Medicare provided different types of benefits, which were separated into different program "parts." Medicare Part B covered, among other things, medically necessary physician

services, outpatient care, and DME such as prosthetics, orthotics, continuous glucose monitors, urinary catheters, and braces.

21. To participate in Medicare, providers, including DME companies, were required to submit an enrollment application. As provided in the application, every provider was required to meet certain standards to obtain and retain billing privileges with Medicare. These standards required providers to: (a) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (b) disclose persons and/or organizations with ownership interests or managing control; (c) abide by applicable Medicare laws, regulations, and program instructions; (d) acknowledge that the payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (e) refrain from knowingly presenting or causing another to present a false or fraudulent claim for payment by Medicare and/or submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

22. If Medicare approved an enrollment application, Medicare assigned the provider a National Provider Identifier ("NPI"), which allowed the provider to submit claims for reimbursement to Medicare.

23. Under Medicare Part B, DME was required to be medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, ordered by a medical professional, and provided to the beneficiary as represented.

24. Medicare used the term "ordering" or "referring" provider to refer to the physician or other health care practitioner who ordered, referred, or certified an item or service identified in a claim for reimbursement.

25. A Medicare claim was required to set forth, among other things, the beneficiary's name, the item(s) or services(s) provided to the beneficiary, the date the item(s) or service(s) was/were provided, the cost of the item(s) or service(s), the name and NPI of the physician or other health care practitioner who ordered the item(s) or service(s), and the name and NPI of the provider who provided the item(s) or service(s).

26. Medicare supplemental insurance, also known as "Medigap," helped fill gaps in Medicare coverage. Medigap plans covered some of the remaining health care costs not covered by Medicare, such as copayments, coinsurance, and deductibles. Such plans were sold by private health insurance companies, including Entity 1 and Entity 2 (both Medicare Supplemental Insurers).

27. Medigap plans provided by Medicare Supplemental Insurers were health care benefit programs, as defined by Title 18, United States Code, Section 24(b).

28. For DME claims, a Medigap plan generally covered approximately 20 percent of the claim amount. Medicare Supplemental Insurers were contractually obligated to reimburse claims that had been processed by Medicare, even if Medicare subsequently suspended payment of the claims.

<u>Overview of the Money Laundering Conspiracy</u>

29. For approximately a five-month period, beginning on or about February 18, 2025, and continuing through on or about July 9, 2025, in the District of Massachusetts and elsewhere, GUGAVA conspired with others known and unknown to the Grand Jury to knowingly engage or attempt to engage in a monetary transaction involving more than $10,000 in criminally derived property.

Object and Purpose of the Conspiracy

30. The object of the conspiracy was to commit money laundering, that is, to deposit, withdraw, or exchange, or attempt to deposit, withdraw, or exchange, funds in excess of $10,000 through a financial institution affecting interstate commerce, knowing that the funds derived from some kind of criminal offense, where the funds were in fact derived from a specified unlawful activity, here, health care fraud.

31. The principal purpose of the conspiracy was for GUGAVA and his co-conspirators to unlawfully enrich themselves by, among other things, diverting criminal proceeds for their personal use and benefit, the use and benefit of others, and furthering the specified unlawful activity.

Manner and Means of the Conspiracy

32. Among the manner and means by which GUGAVA and co-conspirators known and unknown to the Grand Jury carried out the conspiracy were the following:

a. purchasing ND Medical from Individual 1 and transferring ownership of ND Medical to GUGAVA;

b. opening bank accounts in the name of ND Medical at various financial institutions, including Financial Institution 1 and Financial Institution 2, with GUGAVA as the sole signatory;

c. hiring employees to collect checks received from Medicare Supplemental Insurers for claims submitted by or on behalf of ND Medical for DME that was not medically necessary, not properly prescribed by a health care practitioner, and/or not provided;

d. directing the ND Medical employees to provide the checks received from Medicare Supplemental Insurers to one or more co-conspirators;

e. depositing the checks from Medicare Supplemental Insurers into ND Medical's bank accounts; and

f. transferring the funds to financial accounts held in the names of shell companies and ultimately to various overseas bank accounts.

Acts in Furtherance of the Conspiracy

33. Beginning on or about February 18, 2025, and continuing through on or about July 9, 2025, GUGAVA and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

a. On or about February 24, 2025, GUGAVA opened a bank account in the name of ND Medical at Financial Institution 1.




*Banking Surveillance Image of GUGAVA on February 24, 2025 Related to ND Medical Bank Account Opening at Financial Institution 1*

b. On or about March 4, 2025, GUGAVA opened a bank account in the name of ND Medical at Financial Institution 2.

c. On or about June 1, 2025, Co-Conspirator 1, using an encrypted messaging platform, directed ND Medical employees to mail approximately 19 checks from Medicare Supplemental Insurers, totaling $151,674.74, to an address in Brooklyn, New York.

d. On or about June 9, 2025, GUGAVA deposited checks from Medicare Supplemental Insurers, totaling $27,761.64, into the ND Medical account at Financial Institution 1.




*Banking Surveillance Image of GUGAVA at Financial Institution 1 on June 9, 2025*

e. On or about June 12, 2025, GUGAVA deposited checks from Medicare Supplemental Insurers, totaling $41,040.00, into the ND Medical account at Financial Institution 1.




*Banking Surveillance Image of GUGAVA at Financial Institution 1 on June 12, 2025*

f. On or about June 27, 2025, GUGAVA deposited checks from Entity 1 and other Medicare Supplemental Insurers, totaling $76,214.97, into the ND Medical account at Financial Institution 2.



*Banking Surveillance Image of GUGAVA at Financial Institution 2 on June 27, 2025*

g. On or about July 3, 2025, GUGAVA deposited checks from Entity 2 and other Medicare Supplemental Insurers, totaling $76,558.37, into the ND Medical account at Financial Institution 2.



*Banking Surveillance Image of GUGAVA at Financial Institution 2 on July 3, 2025*

h. On or about July 7, 2025, GUGAVA wired or caused the wiring of $71,363.20 from the ND Medical account at Financial Institution 2 to a bank account in Hong Kong.

COUNT ONE
Conspiracy to Commit Money Laundering
(18 U.S.C. § 1956(h))

The Grand Jury charges:

34. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 33 of this Indictment.

35. Beginning on or about February 18, 2025, and continuing through on or about July 9, 2025, in the District of Massachusetts and elsewhere, the defendant,

EREKLE GUGAVA,

willfully conspired with others known and unknown to the Grand Jury to commit money laundering, that is, to deposit, withdraw, or exchange, or attempt to deposit, withdraw, or exchange, funds in excess of $10,000 through a financial institution affecting interstate commerce, knowing that the funds derived from some kind of criminal offense, where the funds were in fact derived from a specified unlawful activity (here, health care fraud), in violation of Title 18, United States Code, Section 1957(a).

All in violation of Title 18, United States Code, Section 1956(h).

FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(1))

The Grand Jury further finds:

36. Upon conviction of the offense in violation of Title 18, United States Code, Section 1956(h), set forth in Count One of this Indictment, the defendant,

EREKLE GUGAVA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in said offense, or any property traceable to such property.

37. If any of the above-described property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 36 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

[redacted]

FOREPERSON

MEGHAN C. CLEARY
ASSISTANT U.S. ATTORNEY
DISTRICT OF MASSACHUSETTS

KEVIN LOWELL, DEPUTY CHIEF
JIM HAYES, ASSISTANT DEPUTY CHIEF
TIFFANY V. WYNN
SARAH W. ROCHA
TRIAL ATTORNEYS
HEALTH CARE FRAUD SECTION, NATIONAL FRAUD ENFORCEMENT DIVISION

District of Massachusetts: September 3, 2026
Returned into the District Court by the Grand Jurors and filed.

Aaron Hutchins
DEPUTY CLERK